Slip Op. 09-58

# UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————            :
                                   :
GILDA INDUSTRIES, INC.,            :
                                   :
                    Plaintiff,     :
        and                        :
                                   :
NESTLÉ WATERS NORTH AMERICA, INC., :
                                   :
        Plaintiff-Intervenor,      :
                                   :
            v.                     :     Before **MUSGRAVE, Senior Judge**
                                   :     Court No. 07-00474
UNITED STATES,                     :
                                   :
                    Defendant.     :
                                   :
———————————————————————            :


## OPINION AND ORDER

[Granting plaintiff's motion for summary judgment.]

Dated: June 16, 2009

*Peter S. Herrick* for plaintiff Gilda Industries, Inc.

*Hogan & Hartson, LLP* (*Jonathan T. Stoel* and *Craig A. Lewis*) for plaintiff-intervenor Nestlé Waters North America, Inc.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Civil Division, Commercial Litigation Branch, United States Department of Justice (*David S. Silverbrand*); Office of the General Counsel for the United States Trade Representative (*William Busis*), of counsel, for The United States of America.

MUSGRAVE, Senior Judge:  This case involves the retaliatory tariffs imposed by the United States Trade Representative ("USTR") in connection with the so called "EC–Beef Hormones" dispute.  Plaintiff Gilda Industries, Inc. ("Gilda"), an importer of toasted breads from Spain, contends that the USTR's authority to impose retaliatory duties expired by operation of law in July 2007, and seeks a refund of the duties that it paid between July 29, 2007 and March 23, 2009.

This matter has returned to the court after the court's denial of the government's motion to dismiss, *Gilda Industries, Inc., v. United States*, 32 CIT __, 556 F. Supp. 2d 1366 (2008) ("*Gilda II*"), and the subsequent grant of the government's voluntary remand to the USTR.  The USTR's *Remand Results*, as well as the remainder of plaintiff's motion for summary judgment, are now before the court.[1]  In responding to the plaintiff's comments on the *Remand Results*, the government does not dispute the propriety of summary judgment, but instead argues that Gilda is not entitled to the relief it seeks as a matter of law; accordingly the court will construe the government's comments as a cross motion for summary judgment.  *See Def.'s Resp.*; CIT Rule 56(e).

This court has jurisdiction over the plaintiff's claim pursuant to section 28 U.S.C. § 1581(i) because Gilda's complaint arises out of a law providing for duties "on the importation of merchandise for reasons other than the raising of revenue" (*i.e.*, the duty at issue was imposed to encourage foreign nations to comply with the WTO settlement agreement rather than to raise revenue) and because no other basis for jurisdiction is available or the basis that is available will yield a remedy that is manifestly inadequate.  28 U.S.C. § 1581(i) (2006); *Gilda Industries, Inc., v.*

---

[1]  The plaintiff's motion for summary judgment was partially mooted by the USTR's decision to remove Gilda's products from the retaliation list.

*United States*, 446 F.3d 1271, 1275 (Fed. Cir. 2006); *Nat'l Corn Growers Ass'n v. Baker*, 840 F.2d

1547, 1555 (Fed. Cir. 1988). For the reasons set forth below, the court will grant the plaintiff's

motion for summary judgment.

### A. Background

The "EC – Beef Hormones" dispute began in 1985 when the European Community

("EC") (now the European Union) banned imports of meat from animals treated with certain growth

hormones. The United States challenged the hormone ban in formal dispute settlement proceedings

before the WTO in 1996. The WTO Dispute Settlement Body ("DSB") found that the hormone ban

was not based on scientific evidence or relevant international standards, and, hence, contrary to the

EC's obligations under the WTO Agreement. *See Implementation of WTO Recommendations*

*Concerning EC– Measures Concerning Meat and Meat Products (Hormones)* 64 Fed. Reg. 40638

(Office of the U.S. Trade Rep. July 27, 1999) (Notice of the imposition of 100 percent ad valorem

duties on certain articles) ("*Imposition of Duties*"). Despite the DSB's ruling, the EC did not lift the

hormone ban. Accordingly, the DSB authorized the United States to suspend tariff concessions up

to the level of nullification or impairment suffered by the United States as a result of the hormone

ban, which, in 1999, was determined to be $116.8 million annually. *Id*.; *see also July 12, 1999 WTO*

*Arbitrator Decision* at 17.

In July 1999, pursuant to the DSB authorization and Section 301 *et seq*. of the Trade

Act of 1974 (as amended),[2] the USTR implemented a "retaliation list" in which various EC products

---

[2] Section 301 *et seq*. of the Trade Act of 1974 (codified at 19 U.S.C. §§ 2411–2419) constitutes the principal means by which the United States responds to unfair foreign trade practices. *See* Chapter 1 of 100 P.L. 418, 1001 (sections 301-309, as amended). Section 301 authorizes (and (continued...)

were targeted with a 100-percent *ad valorem* duty as a retaliatory response to the hormone ban. The

retaliation list included "[r]usks, toasted bread and similar products (provided for in subheading

1905.40)" which the plaintiff imports. *Imposition of Duties*, 64 Fed. Reg. 40640. Therefore, in

accordance with the *Imposition of Duties*, Gilda's toasted-bread products were subjected to the 100

percent *ad valorem* duties from that point forward until March 23, 2009, the effective date of the

USTR's recent decision to modify the retaliation list and remove Gilda's products. *See Modification*

*of Action Taken in Connection With WTO Dispute Settlement Proceedings on the European*

*Communities' Ban on Imports of U.S. Beef and Beef Products*, 74 Fed. Reg. 4265 (Office of U.S.

Trade Rep. Jan. 23, 2009) (Notice and Modification of Action) ("*Carousel Decision*").

       The current matter is Gilda's second challenge to the retaliation list before this Court;

this challenge, like the one before it, involves the "automatic termination" provision contained in

19 U.S.C. § 2417(c). *See Gilda Industries, Inc., v. United States*, 28 CIT 2001, 353 F. Supp. 2d 1364

(2004) (*vacated on other grounds*, 446 F.3d 1271 (Fed. Cir. 2006)) ("*Gilda I*"). Section 2417(c)

provides that if a retaliatory action has been in effect "during any 4-year period," representatives of

the domestic industry benefitting from the action must, within the last 60 days of the 4-year period,

submit to the USTR a formal request for the continuation of the action; if no such request is

submitted, the retaliatory action "shall terminate at the close of such 4-year period." 19 U.S.C.

§ 2417(c) (2006); *see also Gilda II*. Gilda's 2003 challenge to the list was rejected because, *inter*

---

[2] (...continued)
in some cases, requires) the USTR to take action in response to unfair trade practices, and to ensure
enforcement of United States' trade-agreement rights. The actions available to USTR for such
enforcement includes the imposition of "retaliatory duties" wherein the USTR may levy increased
duties on imports from trade-agreement-violating countries. *See* 19 U.S.C. § 2411(c) (2006).

*alia*, the record showed that representatives of the domestic industry had, in fact, submitted requests

for the continuation of the retaliatory action during the last 60 days of the 4-year period that ended

on July 27, 2003. *See Gilda I*, 28 CIT at 2008; 353 F. Supp. 2d at 1370.

   Four years later, Gilda filed the current challenge to the retaliation list. Gilda

contends that, despite the passage of another four years, neither the petitioner nor the domestic

industry submitted to the USTR section 2417(c)(B) requests for another continuation of the action;

accordingly, argues Gilda, the retaliatory measures expired by operation of law in July 2007. *See*

*Gilda II*, 556 F. Supp. 2d at 1368; *Pl's Mot. for Summary J*. at 4-5. Counsel for the government

moved to dismiss the matter, arguing that (1) no such requests were necessary because section

2417(c) only applied to the *first* four year period that the section 301 action was in effect; and (2)

Gilda lacked prudential standing to bring a cause of action under section 2417(c). *Gilda II*, 556 F.

Supp. 2d at 1368.

   The court rejected the government's arguments[3] and denied its motion to dismiss,

after which Gilda moved for summary judgment. The government, in turn, filed a motion to

"remand"[4] the matter to the USTR for consideration of the effects of *Gilda II* on the Beef Hormone

---

[3] The court's analysis of section 2417(c) in *Gilda II* was rendered in response to an argument
presented in the government's brief. Because the interpretation there was proffered by counsel for
the government (and not the USTR) for the purposes of this litigation, the issue of *Chevron*
deference was never raised and was not addressed. *See Gilda II*; *see also Bowen v. Georgetown*
*Univ. Hospital*, 488 U.S. 204 (1988). However, the court wishes to clarify here, that even if the
USTR had proffered that interpretation, the court's conclusion would not have been substantially
different. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005).

[4] *I.e.*, for lack of a better term. Because the USTR never made a decision in the first place,
the court's grant was not technically a "remand."

dispute retaliation list. *Def.'s Mot. for Remand* at 3. The government also stated that, in light of the court's opinion in *Gilda II*, the USTR had belatedly sent to the petitioner and representatives of the domestic industry notice of the potential termination of the retaliation list pursuant to section 2417(c), and that the representatives of the beef industry had promptly submitted requests for the continuation of the retaliatory measures. *Id*. at Exh.'s 1, 2.

        In the *Remand Results*, which are now before the court, the USTR determined that "the lack of notice it provided to the domestic industry pursuant to [section 2417](c)(2)] prior to the issuance of *Gilda [II]* must lead to an extension of the operation of [section 2417(c)(1)] such that the 2008 beef industry responses serve to foreclose the possibility of a termination" of the retaliatory measures. *Remand Results* at 6. The USTR reasoned that the plain intent of section 2417(c)(1) and (2) "is that the USTR may not terminate an action that benefits the domestic industry if the industry requests in writing that the action be continued," and that "the only reason" for the domestic industry's failure to submit timely 2417(c) requests was the USTR's pre-*Gilda II* interpretation that such requests were only necessary after the first four years. *Id.* at 7. The USTR further informed the court that it had performed the review required by section 2417(c)(3), and that, as a result, had decided to modify the retaliation list pursuant to the so-called "carousel" provision contained in section 2416.[5] *Id.* As noted above, the USTR's modifications to the list included the removal of rusks and toasted breads from the retaliation list. *See Carousel Decision*, 74 Fed. Reg. 4265.

---

     [5] Pursuant to 19 U.S.C. § 2416, the USTR must periodically "review the list or action taken and revise, in whole or in part, the list or action to affect other goods of the subject country or countries." 19 U.S.C. § 2416(b)(2)(C).

Plaintiff and Plaintiff-Intervenors argue that the plain language section 2417(c) indicates that the retaliation list terminated by operation of law in July 2007 and that the USTR had no authority to extend the operation of the list. Gilda argues further that the domestic industry could have requested a continuation of the action on their own but failed to do so. Plaintiff-Intervenor argues that no evidence of record suggests that the beef industry's failure to submit such a request was in reliance upon a USTR interpretation of section 2417.

The government argues that the plaintiff's interpretation of section 2417(c) constitutes a piecemeal reading of the statute that ignores the overall purpose of the statute as benefitting the domestic industry. The government asserts that the USTR's interpretation more accurately reflects a reading of that section as it fits within the "harmonious whole" of the statutory scheme. *Def.'s Resp*. at 3. Alternatively, the government contends that the court's decision on the matter must be guided by *Chevron, U.S.A., Inc., v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and that under *Chevron*, the court would be required to defer to the USTR's interpretation of the statute because the "USTR's interpretation of its statutory obligations is reasonable." *Def.'s Resp*. at 4.

### B. Standard of Review

In actions commenced under 28 U.S.C. § 1581(i), the court applies the standard of review set forth in 5 U.S.C. § 706 (2006). *See, e.g.*, *Miami Free Zone Corp. v. Foreign-Trade Zones Bd.*, 136 F.3d 1310, 1312-1313 (Fed. Cir. 1998). Accordingly, "[t]o the extent necessary to decision and when presented," the court must "decide all relevant questions of law;" "interpret constitutional and statutory provisions;" and "hold unlawful and set aside agency action, findings, and conclusions

found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law

. . . ." 5 U.S.C. § 706. The court recognizes further that, because the USTR has now rendered a

decision on the matter, the court's scope of review of that decision is limited; for the court to

intervene in matters relating to international trade, there must be "a clear misconstruction of the

governing statute, a significant procedural violation, or an action outside delegated authority."

*Maple Leaf Fish Co., v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985). Rule 56 of this Court

permits summary judgment when "there is no genuine issue as to any material fact . . . ." CIT R.

56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

## C. Discussion

The sole point of contention in this matter turns on a question of statutory

interpretation. The court must determine whether the statute indicates unambiguously that the beef

industry's failure to submit requests within the time period specified in 2417(c)(1)(B) caused the

retaliatory list to terminate by operation of law on July 29, 2007, or whether the USTR's failure to

notify the domestic industry of the impending termination prevented the operation of the automatic

termination provision. For the reasons set forth below, the court finds that the retaliatory measures

terminated by operation of law on July 29, 2007, and that the USTR's decision finding otherwise is

not in accordance with law.

In arguing that the retaliation list did not automatically terminate, the USTR stated:

It would be inconsistent with its statutory responsibilities to terminate the
action under Section 307(c) in the circumstances presented by this remand . . . .

The plain intent of Section 307(c)(1) and (2) is that the USTR may not
terminate an action that benefits the domestic industry if the industry requests in
writing that the action be continued. The USTR determines that the only reason that

representatives of the U.S. beef industry did not formally request continuation of the July 1999 action 60 days prior to the eight-year anniversary of the July 1999 action was that the USTR had not understood the statute to call for a Section 307(c) review of necessity in 2007, and that the USTR thus had not provided the notification provided in Section 307(c)(2). As soon as the USTR did provide the notification provided for under Section 307(c)(2), representatives of the U.S. beef industry requested a continuation of the action in writing.

Accordingly, USTR determines that the lack of notice it provided to the domestic industry pursuant to Section 307(c)(2) prior to the issuance of *Gilda* [*II*] must lead to an extension of the operation of section 307(c)(1), such that the 2008 beef industry responses . . . serve to foreclose the possibility of a termination of the July 1999 action.

*Remand Results* at 6-7.

Because the USTR is interpreting a statute that it is tasked with administering, the court must begin its analysis with the familiar two-step process described in *Chevron*. In the first step, the court must look to whether Congress has directly spoken on the issue. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 843. The court reaches the second step if it finds the statute to be silent or ambiguous. If so, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

In matters of statutory construction, "the beginning point must be the language of the statute." *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991). Because the text of the statute is "Congress's final expression of its intent," the court must give effect to the clear meaning of the statute as written. If the language of the statute itself is clear and unambiguous with regard to the question at issue, the court's inquiry is at an end. *Timex V.I. Inc.*, *v. United States*, 157 F.3d 879, 881-882 (Fed. Cir. 1998).

Section 2417(c) provides:

(c) Review of necessity.
  (1) If—
     (A) a particular action has been taken under section 301
     [19 U.S.C. § 2411] during any 4-year period, and
     (B) neither the petitioner nor any representative of the domestic
     industry which benefits from such action has submitted to the
     Trade Representative during the last 60 days of such 4-year period
     a written request for the continuation of such action,
  such action shall terminate at the close of such 4-year period.
  (2) The [USTR] shall notify by mail the petitioner and
  representatives of the domestic industry described in paragraph (1)(B)
  of any termination of action by reason of paragraph (1) at least 60
  days before the date of such termination.
  (3) If a request is submitted to the [USTR] under paragraph (1)(B)
  to continue taking a particular action under section 301, the [USTR]
  shall conduct a review of—
     (A) the effectiveness in achieving the objectives of section 301
     of—
       (i) such action, and
       (ii) other actions that could be taken (including actions against
     other products or services), and
     (B) the effects of such actions on the United States economy,
     including consumers.

19 U.S.C. § 2417(c) (2006).

As the above-quoted text indicates, section (c)(1) provides that if (A) a retaliatory

action is being taken in any four year period and (B) the domestic industry fails to submit a request

for the continuation of the action "during the last 60 days of such 4-year period," the retaliatory

action "shall terminate at the close of such 4-year period." Hence, the statute informs the reader

what will be terminated (the retaliatory action); when it will terminate (at the close of such 4-year

period); how it will terminate (by operation of law); and what may be done to prevent that

termination (a request from the domestic industry submitted "during the last 60 days of such 4-year

period"). The text of section (c)(1) is conspicuously devoid of any reference to actions by, or the discretion of, the USTR. Although sections (c)(2) and (c)(3) impose other requirements on the USTR, those provisions are listed separately from, and follow after, the automatic termination provision; nothing in the text of the statute indicates that the USTR's failure to perform the duties outlined in section (c)(2) or (c)(3) in any way affects the automatic termination provision contained in section (c)(1).

Although the government asserts that reading the statute as a "harmonious whole" supports an interpretation that the USTR's failure to provide 2417(c)(2) notice "must lead to an extension of the operation" of section (c)(1), such a complicated result cannot be inferred from the statute on its face. Moreover, because other provisions contained in section 301 expressly provide that some of the USTR's actions *are contingent* upon an actual consultation with the domestic industry (which entails, at the very least, notice) and *do* involve the USTR's discretion, the court is loathe to judicially insert such a provision where none exists. *See* 19 U.S.C. §§ 2417(a)(2) ("Before taking any action under paragraph (1) to modify or terminate any action taken under section 2411 of this title the [USTR] shall consult with the petitioner, if any, and representatives of the domestic industry . . . ."); 2416(b) ("Before making any determination under subsection (b) of this section, the [USTR] shall . . . consult with the petitioner . . . and any representatives of the domestic industry"). Indeed, because the automatic termination provision becomes operative without the discretion or approval of the USTR, it seems quite clear that Congress did not intend to give the USTR any discretion in the matter. Accordingly, it would be contrary to the plain language of the statute to interpret the provision as contingent upon the USTR's performance of its own duties, or to find that

the USTR has the discretion to delay the onset of a termination provision that is, by its very nature, automatic and nondiscretionary.

The court's reliance solely on the plain language of the statute does, in effect, impose some extra responsibility on the domestic industry. However, such responsibility is not, as the government asserts, contrary to the overall purpose of the statute as benefitting the domestic industry. The court's reading of the statute requires only that the domestic industry monitor the situation closely enough to know the ending date of the next four-year cycle (as the plaintiff did here) and to send the continuation request if it wishes to do so. Although this slight burden requires the domestic industry to be somewhat more involved in the situation, such a requirement hardly seems inconsistent with the purpose of the statute.

Finally, the government repeats the USTR's assertion that the only reason for the domestic industry's failure to submit timely requests was because they relied upon "the USTR's previous interpretation" of section 2417(c) as being inapplicable after the first four-year period. *Def.'s Resp*. at 8. The government suggests that the appropriate response would be for the court to interpret the statute as operative from the date of the court's decision in *Gilda II*, as opposed to the date of enactment. The government contends that "where parties 'rightly or wrongly' interpret a provision one way, only to learn through an intervening court decision" that the provision should be viewed differently, "the Court's decision should become the operative time from which parties should be on notice of the correct interpretation." *Id*. at 11 (quoting *Amber Resources Co., v. United States*, 538 F.3d 1358, 1370 (Fed. Cir. 2009).

There are several problems with this argument. Even if it were determined that the automatic termination provision was subject to some form of equitable tolling, the interpretation

upon which the domestic industry allegedly relied— that section 2417(c) had no effect after the first

four years— appears to have been advanced for the first time by counsel for the government during

the course of this litigation.  Although the USTR later stated in the *Remand Results* that it "had

understood" section 2417(c) as applying after the first four years "and not in subsequent years," the

record contains no evidence that the USTR ever communicated that understanding to the domestic

industry, or, for that matter, communicated it to anyone.

       Moreover, the court is not persuaded that the Federal Circuit's analysis in *Amber*

*Resources* can be applied in a case that does not involve contract law.  *Amber Resources* involved

the enactment of an environmental statute that materially altered the terms of certain Federal land-

lease contracts; however, because neither party understood the new statute as applying to their

contracts, both parties continued to perform under the agreements until a court ruling on the matter

issued some eleven years later.  When called upon to determine the precise date of the contract

breach, the Federal Circuit construed the statute as operative from the date that the parties were on

notice of the correct interpretation—as opposed to the date of the statute's passage—essentially

because the parties had continued to reap the benefit of those contracts for eleven years after the

contract-breaching statute was enacted.  *Amber Resources*, 538 F.3d at 1370.  In sum, the Federal

Circuit's deviation from the rule that court decisions interpreting statutes "merely announc[e] what

the law has meant since its enactment" was for the purpose of determining the point in time at which

a breach of contract occurred, and was based on concepts unique to contract law.  *Id*.  The court can

see no reason (indeed we can see many reasons not to) import principles of contract law into the

arena of administrative law, and the government has provided none.  Accordingly, this argument

must be rejected as well.

### D. Conclusion

In consideration of the foregoing, the plaintiff's motion for summary judgment is granted as to that portion of the requested relief that has not been mooted by the USTR's removal of Gilda's products from the retaliation list.  Accordingly, Gilda's imports of rusks or toasted breads from Spain entered after July 29, 2007 must be liquidated without the 100 percent retaliatory duty described herein.  Further, the U.S. Department of Customs and Border protection shall refund to the plaintiff all of the retaliatory duties (described herein) collected on Gilda's toasted bread imports from Spain between July 29, 2007 and March 23, 2009.  *See Shinyei Corp. of America v. United States*, 355 F.3d 1297 (Fed. Cir. 2004) (holding that reliquidation is not prohibited where a decision of Customs is not being challenged).

_____/S/    R. Kenton Musgrave_____
R. KENTON MUSGRAVE, Senior Judge

Dated: June 16, 2009
New York, New York

# UNITED STATES COURT OF INTERNATIONAL TRADE

|   |   |   |
|---|---|---|
| GILDA INDUSTRIES, INC., | : | |
| | : | |
| Plaintiff, | : | |
| and | : | |
| | : | |
| NESTLÉ WATERS NORTH AMERICA, INC., | : | |
| | : | |
| Plaintiff-Intervenor, | : | |
| | : | |
| v. | : | Before **MUSGRAVE, Senior Judge** |
| | : | Court No. 07-00474 |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## JUDGMENT

This action, having been duly submitted for decision, and this court, after due deliberation, having rendered a decision herein; now, in conformity with that decision, it is hereby

**ORDERED** that the plaintiff's imports of toasted bread products from Spain (provided for in HTSUS subheading 1905.40) entered after July 29, 2007, must be liquidated without the 100 percent *ad valorem* retaliatory duty described in the attached opinion. It is further

**ORDERED** that the U.S. Department of Customs and Border Protection shall refund to the plaintiff, with interest, all of the retaliatory duties collected on plaintiff's imports of toasted bread products from Spain (HTSUS subheading 1905.40) that were entered between July 29, 2007 and March 23, 2009. It is further

**ORDERED** that the remainder of plaintiff's Motion for Summary Judgment, as well as plaintiff's May 21, 2009 Request For the Status of its Motion for Summary Judgment, are hereby denied as moot.

/S/    R. Kenton Musgrave
R. KENTON MUSGRAVE, Senior Judge

Dated: June 16, 2009
New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.


Tina Potuto Kimble
Clerk of the Court


Date: _____          By: _____
                                                            Deputy Clerk